I'd like to reserve three minutes if that's okay with you. Okay, please watch the clock. Thank you. So, the issue in this case is really simple. It's a simple pleading case where the district court took a factual issue and treated it as a legal issue. And that issue being whether telling the appellant that she would be arrested if she pressed charges would deter her from exercising her right to petition the government for grievances. Our position is, of course it would. Any person who is trying to press charges, if they're told that they're going to be arrested for doing that, is going to withdraw, is going to not press charges. That's exactly what happened. The district court said that I guess Mr. Martinez, Officer Martinez, was just making a factual statement. It was not a factual statement. It was completely incorrect in every way. It was also, it was not supported by what he saw. It was not supported by the law. And there's just no reasonable way, there's no reasonable officer that could have viewed it that way. He might have been mistaken, but that would have been an unreasonable mistake for him to say that, you know, it's a matter of fact that if he presses charges, I have to arrest you too. And that's something that we also, we press in the district court as well. Was he required to arrest if the two combatants weren't involved in a domestic relationship? No, he's not required to arrest. But that's not really the issue is whether he was required to arrest. The issue is whether our client's right to petition the government for redress of her grievances, whether that was chilled. And, you know, the fact that she actually did say that she wanted to press charges and that she later said that she didn't after she was told that she would be arrested. That's the issue. The officer, you know, would have discretion not to arrest her assailant. But the real issue here is that she was prevented from pressing those charges. And that allowed him to go, you know, her attempted rapist and her, you know, he beat her pretty severely. That's what the video shows. That's what the pictures show. And there's, you know, there's no reason, there's no reasonable officer that would have believed under those circumstances that that could not be interpreted as, that that would not chill her from pressing charges against her assailant. That's our position. And I also, I believe that the video, which was lodged with the court, and I believe the court is in receipt of that, adds some context to it. Because sometimes, you know, just the transcript of the situation sometimes might not convey the whole picture. But you can tell, you know, when you hear them talking, she's badly beaten up. And you can hear that the assailant, Mr. Bravo, has, you know, said that he doesn't want to press charges. There's no way that somebody in the officer's position would not realize that telling her that she'd be arrested, and his words, you know, quote, is he said, no, you're going to go. That's telling her directly, you will go to jail if you press charges. So there's only one way a reasonable person in her position could understand that. Did the district court dismiss this on a motion to dismiss or on a motion for summary? No, this was a motion to dismiss. So this is a pleading case. So, you know, if it's a motion for summary judgment after, you know, a lengthy discovery and some depositions, and we could find out why the officer did what he did, and maybe the record could be developed, that might be a different question. But on pleadings, you know, just off the video alone and off the, you know, verbatim quotes of what he said, this should be sufficient at least for the case to go forward on this claim, her only claim. Did the district court arguably decide the issue of qualified immunity for the officer? I would suggest he wasn't very clear and that he or she wasn't very clear in that. No, he didn't. This was decided, he decided that it wasn't a violation of her rights. Now, that is sort of folded into the first prong of qualified immunity. You know, you have to decide it's a violation first, and then you go to whether it's clearly established. And I believe we, you know, we addressed that in the briefing, and the appellees raised that in their answering brief, and we addressed it in our reply. But the law was clearly established because we have several cases that say implied threats or warnings that imply some sort of an adverse action, that's sufficient for a First Amendment claim. The Supreme Court has told us that for qualified immunity, the case has to be very closely on point. What's your best case? Yes, I'm very familiar with all the Supreme Court's line of qualified immunity cases, but they've also said that it doesn't have to be completely factually on point. It needs to give the officer fair warning. And really, the policy underlying qualified immunity is the real thing here. It's officers who are trying to faithfully uphold the law and are acting reasonably under the circumstances. The idea is that they shouldn't be financially liable for making a mistake. Now, if an officer acts unreasonably and, you know, acts recklessly, and there's the Lanier case from the Supreme Court. It says that if the officer has fair warning based off the previous state of the law, even if the exact precise factual scenario hasn't arisen before, that can be enough for liability under Section 1983. What's your best case? I'm sorry? What is your best case? The Brodheim case, which is from 2009. That wasn't a prison setting. Right, it was, but the setting of it I don't believe is the – those are not material facts. The fact is it involved a First Amendment, you know, right to petition, and that it involves the officer making an implied threat. And, you know, telling the person in that case that he needs to be careful, be careful, without any, you know, any specific sort of say be careful or this is going to happen to you. That's enough for First Amendment liability. Certainly telling somebody that you're going to go to jail if you press this grievance, that's, you know, that would certainly deter anybody from filing a police report or from pressing charges. So, but it's not just that case. There's the Bernhardt case, which we cited in our briefing. It's from a district court, and I believe it also relies on Brodheim. And it's, you know, just telling somebody, I believe the officer there, he said, he said, you'll be lucky if you eat tomorrow. Now that, it's hard to even, you know, that wouldn't be a criminal threat. That wouldn't be enough for a true threat if, you know, if you were to prosecute that officer. But that would certainly be enough for First Amendment violation because a reasonable person could interpret that as saying, okay, I better, you know, because the plaintiff in that case had lodged some sort of a grievance against this officer. And he, you know, would be chilled. He would be, he would be, he would feel like he would need to withdraw it because he might not eat the following day. So point being that a reasonable officer knows that it doesn't need to be a true threat in the sense of, you know, threatening harm against somebody in order to have First Amendment liability. There's cases in this court and in the lower courts within the circuit that make that very clear. And the officer, you know, a case decided in 2009, that's more than enough time for the officer to be on notice that he can't, that he can't just say these sorts of things and expect that, you know, expect that it's not going to chill a plaintiff's First Amendment speech. But what you're really saying, though, is that the district court did not reach the issue of qualified immunity. So at the very least, we should send it back to the district court for that decision to be made. I would agree with that. He did not reach the issue of qualified immunity. He didn't reach that second prong about whether it's clearly established. So if this court, you know, I believe that the court could send it back on that basis. I do agree. If you are able to proceed with the case, what is your theory of damages going to be? Because here, eventually, the assailant, I understand, was arrested. Eventually, yes. After a lengthy process of petitioning the government and approaching DAs, and she had to, you know, hire counsel to advocate for her eventually. Yeah. Our theory of damages is going to be that it prevented her from getting access to justice from, you know, just as a victim, for one, but also, you know, to proceed against him as a convicted criminal. I understand that, well, I won't get into too many things that are off the record, but there's more that could have been gone into about Mr. Bravo himself and his relation to, you know, powerful people as, you know, as potentially a reason for why things proceeded as they did, because it's honestly baffling, you know, that. But, yeah, there's, yeah, the damage itself, of course, is her being deterred from, you know, being chilled from exercising her First Amendment rights. I think what Judge Bress is asking is you have a theory that perhaps this assailant had some connections and that's why he wasn't charged. That may or may not be. That's not really before us. But what is she going to show the jury if she gets to a jury as to what her damages were? Well, her damages were that she was a victim of a very serious beating, and as a victim, she had a right, and not just a First Amendment right, but a right under the state law in order to have her attacker prosecuted, arrested and prosecuted. Now, of course, any time you're dealing with violations of constitutional rights, somebody might look at it from, you know, a purely economic perspective and decide, well, it's just a right, it's not worth anything. The jury could decide that's worth a lot. Yeah, that's her First Amendment right. It's violated. She was deterred from pressing charges against him. He went free, and he got to go as a free man for a lengthy period of time until, you know, eventually after a lot of time and actually, you know, the money that she had to spend advocating for herself in order to get him prosecuted. Those are all things that she could bring up in relation to, you know, her damages as a result of, you know, her being chilled. One question about your, you know, the – I imagine there's lots of situations out in the field where people are in an altercation and the police are asking, do you want to press charges, and people don't end up going forward with that. And what implication of your lawsuit is that, you know, a lot of these are going to now turn in – when somebody doesn't press charges, they can then come in later and say, well, I felt pressured not to press charges, or I felt that the police were suggesting to me that I shouldn't press charges because that could be bad for me. And that would seem to be something that happens a lot. And are we going to have a run of lots of times cases like this? This one may be, in your view, I understand, more extreme, but you can see a genre of cases that could raise a lot of questions in terms of, you know, federal courts essentially looking at very small details of police interactions about charges that were never moved forward. Perhaps if we were asking for a broad pronouncement from this court, but we're not. We're saying on the facts of this case, based on the situation this officer confronted, a grievously injured, you know, reporting party, she reported that he had attempted to rape her as well. These are very serious allegations, and you can see from the video, her assailant not injured, no visible injuries. And under those circumstances, we're not asking for a broad pronouncement from the court that every time that there's, you know, some sort of, you know, an allegation of mutual combat, you need to arrest the guy, or you need to, you know, you need to make sure that you don't, you know, warn somebody that they, you know, about a mutual arrest or something like that. But under these circumstances, that would not have been reasonable for any officer. I'd like to reserve the rest of my time if that's possible. All right. Thank you. I hear from Liz. Good morning, Your Honors. Marietta Rietveld on behalf of the defense. Can you adjust the e-speakers? I'm having trouble hearing you. Marietta Rietveld on behalf of defendant and appellee, City of Los Angeles. Yes, thank you. I'd like to emphasize three points. Appellant does not allege facts showing that the police made the threat to arrest her. According to the complaint and the supporting transcript and video that they have submitted, Officer Martinez gave appellant the option of making a private person's arrest and informed appellant that Max Bravo also had the right to a private person's arrest. And at that point, he knew that Bravo said he wasn't going to do that. Exactly. And I think you need to look, though, at the full context of what happened. When Officer Martinez, there are several statements that he made before the targeted statement. First of all, when the police showed up at the scene, they restrained Bravo in handcuffs. They offered appellant an ambulance and repeatedly encouraged her to let the medical team treat her wounds. And they asked appellant to give them the full account of her events. Officer Martinez then told her she had the right to make a private person's arrest. If she did, quote, you have to go to court. And, quote, you have to answer the phone when the detectives call. And Mr. Bravo over there, angry, drunk, and combative, may decide to press charges when he learns you're pressing charges against him, at which point everyone's going to jail for booking. When Officer Martinez told her that if Bravo decided to arrest her, she would go to jail, her response was, quote, bring it on. And when she said that, Officer Martinez said, okay. But then she specified she did not want to go to jail right then because, quote, she had to get her dog and she wanted to go home first, to, quote, ice her face. Officer Martinez's response was, quote, that's okay, but we're still going to take a report and document what happened today. And he asked her once again, if you want to press charges, I'm asking. And she confirmed she did not want to press charges right then. She wanted to go home first. And then, as it turns out, shortly thereafter, she did press charges. This interaction does not show that Officer Martinez threatened to arrest her. Instead, as the district court put it, Officer Martinez told appellant, quote, if Bravo chose to go forward with pressing charges against her, she would face the same consequences. And with a private person's arrest, you have to go to jail and fill out the paperwork. Why would he say that, given the factual situation that was presented to him? Apparently she looked pretty beat up and was pretty upset, and he did not. I'm unfamiliar with the intricacies of the law down in Los Angeles. I come from the state of Washington, and perhaps it's a little different. But why would he say that to her? Why would he say that if? Yeah, that if you press charges, he might too, and then I'm going to have to arrest you both. Why would he say that? Well, I think if you look at the transcript and you see that Mr. Bravo is angry, he's combative, he's drunk, he's a little bit not making sense. And in this officer's experience, he may have thought that once this guy hears that you're pressing charges against him and he's denying any responsibility for this and claiming it's all your fault, he may, out of revenge, this may be what the officer saw happened out of his experience. Well, under the city law, do the police have to arrest everybody involved in an altercation? I mean, most law enforcement officers that I've dealt with are pretty good at figuring out what happened. I realize it's up to the court of law for criminal charges and all that, but they're tasked with the duty of, one, getting peace back to an unpeaceful situation and then figuring out who's at fault and making sure that once they leave the scene, that the situation remains peaceful. And that oftentimes, if it's a domestic situation, I think most jurisdictions have a duty to arrest. I assume Los Angeles does as well. But if it's not a domestic situation, and that's what they were trying to figure out, I assume they have more discretion to arrest or not to arrest. But I also assume they have the discretion to arrest the assailant and not the victim. And here, Ms. Shearer is saying, I was clearly and obviously the victim, and they were telling me that if I bring charges, they were going to arrest me. So why would he say something like that? So this goes to my second point. I think what Appellant is arguing and what you're concerned about is the police were wrong not to arrest Bravo, not to treat this as a domestic violence situation, not to discourage dual arrests as required under state law. I don't think that's relevant to what we're looking at here, which is a First Amendment claim, based on an argument that the police threatened to arrest her. What the district court found and what the allegations in the transcript show is the police were clear that we're not going to arrest anybody here. Bravo may arrest you, and if that happens, under the penal code, they're required to take her into custody. But didn't Bravo say he didn't want to press charges? He did, and I think we're looking at the whole context here, that Bravo was drunk and combative, and the police were saying, just so you know, this is what's going to happen. You're going to have to go to court. You're going to have to answer the phone when they text you. He says, are you going to jail? She says, I don't want to go right now. And Martina says, you're going to go? And she says, right now? Martina says, yes. And she said, are you kidding me? She says, nope, that's how it works. So Martina pretty clearly said, if you press charges, you're going to jail, which is untrue. He very clearly said before that, I'm not arresting anybody, but if Bravo presses charges, you're going to jail right now. And she said, I don't want to go right now, but shortly thereafter. And he says, you're going to go. I mean, I'll tell you, you get more clear. She didn't say, if Bravo presses charges, you're going to go. He said, you're going to go. And she says, right now? And he says, yes. She says, that's how it works, which was untrue. I agree with you if you take that comment in isolation. That's what it is. Well, that's the immediate one when she wants to press charges. And it couldn't be clearer that he's going to take her to jail regardless, which is untrue. I think he's saying, if Bravo presses charges, you're going to go to jail. Yeah, but that's not what he says. Counsel, I'm going to – Please. Unless you had a follow-up, I didn't want to interrupt your –  Okay, so I asked your opposing counsel if this was a motion to dismiss or a motion for summary judgment. He says a motion to dismiss. When I'm sitting as a district court, when we're dealing with a motion to dismiss, we're only looking at the pleadings. But you keep referring to transcripts.  You keep referring to declarations. Did this motion to dismiss get turned into a motion for summary judgment because non-pleading material was put before the judge? Well, I think that's – I'm confused. I understand that, yes. I'm not challenging you. Just tell me what happened. Yes, well, so appellant lodges the material with the district court. And in one sense, you could say, well, it wasn't directly incorporated into the complaint. But I think, from our view, this goes to the question of what could they amend to cure this defect, right? So they're treating the transcript and the video as part of the motion to dismiss, and so am I. But it's only to sort of the larger question. But you're right. Technically, the motion to dismiss is just on the complaint. But here, the water was a little muddied because of that procedure. Well, the parties agree it was a motion to dismiss, not a motion for summary judgment.  Okay, so just one follow-up question then. Did the trial judge arguably deal with the qualified immunity by finding there was no constitutional violation? Therefore, they don't need to go into that second prong of the qualified immunity analysis. I agree with the appellant's counsel that the district court didn't reach it. But I think that there's no need to remand this to the district court when this is a pure issue of law, qualified immunity. And even if there was a First Amendment violation, the officers are entitled to qualified immunity because their conduct did not establish, did not violate clearly established law. There's no precedent for finding that the police violate the First Amendment when they tell a person that a third party may arrest them via a private person's arrest. There's no circuit that has, in a published or unpublished decision, addressed whether making such a statement suggests an adverse action by the police that could chill First Amendment activity. Brodham is not on point. As you pointed out, Judge Acuda, it's a prison case where the employee there threatened, gave the prisoner a warning. And then the court also looked at the fact that the employee then requested a transfer of the prisoner and said, well, this was an adverse action. There's discussion as to what Officer Martinez was implying here, but there's nothing that has been alleged as to anything implied or inferred by his statement. His statement meant what he said, which is, if Mr. Bravo presses charges, when he hears your pressing charges, we're all going to go to jail right now. Are you prepared to do that? One question here is we seem to be making some inferences off of the transcript and the video. I'm not necessarily saying the inferences are unreasonable, but it does raise the question of whether it's premature to be deciding it at a motion to dismiss. I do think at the motion to dismiss stage we have to infer. Any inferences have to go in the appellant's favor. I'm, in a way, responding to the arguments that he's making, that there were inferred threats. And I just, you know, the threats don't have to be explicit, but I don't know what that means. I mean, the threat was if Mr. Bravo arrests you, you have to, you know, if he arrests the police under Penal Code 142, have to take her into custody. And then they were telling her, you're going to go to jail right now to look in. You're injured. You seem to not want to go. I think that's what the police were probing. Is it not at least a little misleading to say this, having known that Bravo had just said he wasn't going to press charges? He could have changed his mind, and I guess that's the point. But couldn't somebody regard the statement as a little misleading given the nature of what he had just heard? I think if you're looking in the context here where the police is like, listen, here are all the things you have to do. If you're going to press charges, like this is what's required. Are you ready to do this? I think in that context it's reasonable to think, and in the context that the police were helping her in all these other ways. They escorted her to get her stuff. They made sure she got safely home. They repeatedly offered her medical care. They wrote down all her statements. I think in this context it doesn't suggest that the police were threatening an adverse action. There are other parts of the context, right, which is she is badly injured on the video, clearly bleeding in distress, and he does not look like he's been through much of anything. So how does that cut in all of this? I think the transcript, the complaint acknowledges he did have scratches. He was clearly the more powerful party and had injured her more severely. But the police took the view that this was a mutual battery, that both had been injured, that both had conflicting statements. But that was wrong, right? I mean, he was obviously the primary, and under California law they were required to discourage him. I didn't see the officer tell her, you know, it's our job to discourage him from pressing charges, and he says he is from pressing charges, so do you want to press charges? I didn't hear that. I hear the court's concern that the police were wrong here in that argument, and I would argue the court should focus on the First Amendment-alleged violation. Whether they were wrong or not doesn't go to whether there was a violation, whether the police, and back to qualified immunity, whether there was established case law, giving the police fair notice that if they told her that a third party had the right to exercise a private person's arrest and would do that, whether that would violate her First Amendment rights. This is not one of those cases. There's no case on point or closely on point. It's not one of those cases where it was so obvious that qualified immunity wouldn't apply, and the damages are that there was a short delay. She went home, she attended her injuries, and then she pressed charges, and that's all that's at issue. And so to close this, the state of the law at the time of the incident didn't provide a fair warning to the officers that these statements violated the law. They're entitled to qualified immunity, and I think this court can decide that right here. Thank you. Thank you. Briefing, Your Honor. So just responding to the suggestion that this court should decide qualified immunity, the lower court did not decide the clearly established issue. The first time that we had an opportunity to address it is in the reply brief. So should this court decide that an appellant has sufficiently alleged a constitutional violation, I believe this court, if it's inclined to even go into the qualified immunity, it should remand to the district court so that we can have a full opportunity to brief it. Any further questions? Apparently not. Thank you. Thank you, Your Honor. Okay, the case of Joy Hoescher v. City of Los Angeles is submitted.
judges: IKUTA, BRESS, Bastian